IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KATRINA R. BEN, | * | |
| Plaintiff | * | |
| v. | * | Civil Action No. DKC-17-3054 |
| CHRISTOPHER MOSKAL, SHANE SCOTT, DARREN M. POPKIN, | * | |
| Defendants | * | |

***

# MEMORANDUM OPINION

Self-represented plaintiff Katrina R. Ben, an inmate presently incarcerated at the Maryland Correctional Institution for Women in Jessup, Maryland, filed a verified civil rights complaint pursuant to 42 U.S.C. § 1983 against Defendants Christopher Moskal, Shane Scott, and Sheriff Darren M. Popkin. ECF No. 1. By Order dated January 10, 2019, the court granted Ms. Ben leave to file an amended complaint. ECF No. 33. In the amended verified complaint, Ms. Ben alleges that Defendants acted with "malice, gross negligence, deliberate indifference to her safety and serious medical needs, unnecessary and wanton infliction of pain, and cruel and unusual punishment, in violation of her rights guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution." ECF No. 29. She seeks compensatory and punitive damages. *Id.* at 13.

Defendants subsequently filed a motion to dismiss and/or for summary judgment, ECF No. 37, which Ms. Ben opposed, ECF No. 42. Defendants filed a reply on May 9, 2019. ECF No. 44. Having reviewed the submitted materials, the court finds that no hearing is necessary. *See* D. Md. Local Rule 105.6. For the reasons set forth below, Defendants' dispositive motion, construed as a motion for summary judgment, will be granted.

## BACKGROUND

I. **Ms. Ben's Allegations**

Ms. Ben claims that on October 17, 2014, while her criminal trial was pending in the Circuit Court for Montgomery County, Maryland, she was transported by Defendants, Deputy Sheriffs Moskal and Scott ("Deputies"), from the Circuit Court to the Montgomery County Correctional Facility. ECF No. 29 at 3. Ms. Ben alleges that the Deputies directed her to sit on a full-length bench, "immediately next to the back door" of a transport van that lacked seat belts. *Id.* Ms. Ben states that she was handcuffed with both wrists behind her back and that she was holding a folder full of loose legal papers. *Id.* She was the only inmate being transported in the van at that time. *Id.* According to Ms. Ben, Deputy Moskal was the driver of the transport van and Deputy Scott sat in the front passenger seat. *Id.* A steel partition with a window mostly covered by a solid board separated her from the Deputies. *Id.*

Ms. Ben alleges that they exited the garage of the Circuit Court shortly after 5:00 p.m. and traveled down Maryland Avenue towards I-270, in heavy traffic. *Id.* She claims that approximately 10 minutes after exiting the garage, Deputy Moskal "suddenly accelerated for a few seconds and then suddenly slammed on brakes," forcefully jolting her body. *Id.* at 4. Ms. Ben states that she slid halfway down the length of the metal bench and came to a rest in the center. *Id.* Approximately two minutes later, Deputy Moskal "suddenly accelerated in heavy traffic and abruptly slammed on [the] brakes" again, forcefully jolting her body "with great speed and force, rapidly and involuntarily slid[ing] down the remaining length of the metal bench" before slamming into the steel partition and landing on the floor of the van. *Id.* Ms. Ben claims that she was wedged in between the the steel partition and the metal bench, with her handcuffed wrists under her body,

2

causing "excruciating" pain. *Id.* According to Ms. Ben, her arms were awkwardly bent behind her back and her shoulders jammed up into their sockets. *Id.*

Thereafter, Deputy Scott leaned towards the window of the steel partition and asked Ms. Ben, "Are you okay back there?," to which she replied, "No. I'm in pain." *Id.* Ms. Ben alleges that the Deputies immediately resumed their personal conversation while Deputy Moskal continued to drive "despite passing numerous accessible side streets and through a residential area." *Id.* Ms. Ben's body rocked from side to side as Deputy Moskal continued to drive, frequently switching lanes, causing her worsening pain and a "swimming feeling" inside her head. *Id.* Ms. Ben claims that the Deputies failed to exit the vehicle to assess her condition, report the incident, or call for emergency or medical assistance. *Id.* at 4-5.

According to Ms. Ben, Deputy Moskal stopped the transport van at a traffic light, sat there for minutes, then resumed driving into I-270, where he increased his speed, frequently switched lanes, and rapidly hit bumps on the road. *Id.* at 5. As Ms. Ben remained on the floor of the van, the continuous swaying tightened her handcuffs and increased her pain and discomfort. *Id.* Once again, Deputy Scott leaned towards the window of the partition and asked, "Are you okay back there?," to which Ms. Ben replied, "No. I'm in pain." *Id.* However, the Deputies continued to drive without stopping the vehicle or calling for medical assistance. *Id.*

Eventually, Deputy Moskal exited the highway, stopped the van, and the Deputies left the vehicle "for an extended period of time." *Id.* Ms. Ben claims that when they returned, they opened the back door and Ms. Ben recognized their location as the Montgomery County Detention Center ("MCDC") located at 1307 Seven Locks Road, Rockville, Maryland 20854. *Id.* Ms. Ben states that the Deputies were accompanied by multiple cuffed male inmates who were being transported from MCDC to MCCF. *Id.* At that time, Ms. Ben told the Deputies that she had pain in her head,

3

just behind her right eye and extending to her right shoulder. *Id.* Deputy Scott then entered the van and lifted Ms. Ben from the floor to the bench, causing excruciating pain, while leaving Ms. Ben handcuffed with her wrists behind her back. *Id.* at 6. After Ms. Ben reported increased pain to her shoulders, Deputy Scott repositioned her handcuffs to place her wrists in front. *Id.* According to Ms. Ben, her right shoulder quickly dropped into a lower position, causing her right shoulder pain to increase. *Id.*

Ms. Ben states that the Deputies informed her that they would drive her to the hospital, but neither Defendant called for an ambulance or notified MCDC medical staff of Ms. Ben's need for medical attention. *Id.* The Deputies then secured the back door of the van, with Ms. Ben alone in the back, and left MCDC. *Id.*

Ms. Ben claims that on October 18, 2014, at 5:30 a.m., she woke up in a bed at Shady Grove Hospital with no recollection of events after leaving MCDC. *Id.* Ms. Ben states that she was informed by medical staff that she was brought to the hospital, "seizing on arrival, in the back of a transport van and had been diagnosed with new onset seizure disorder due to head trauma." *Id.* Ms. Ben claims that an MRI showed an enlarged vessel on the right side of her head and that she experienced multiple seizures while hospitalized. She was discharged on October 19, 2014, wearing a sling on her right arm. *Id.*

Ms. Ben states that she had no history of seizures prior to her transport on October 17, 2014. *Id.* She claims that she continues to suffer from epilepsy and continues to take the prescription medicine Keppra, an antiepileptic, to manage seizure episodes, "which have caused more injuries over the last nearly three years." *Id.* at 6-7. She also claims that she suffers emotional distress as a result of the incident. *Id.* at 7.

## II. Defendants' Motion

Defendants have filed a dispositive motion arguing that: (1) Sheriff Popkin is entitled to Eleventh Amendment immunity from suits against him in his official capacity; (2) all Defendants are entitled to qualified immunity as to Ms. Ben's claims based on the lack of seat belts in the transport vehicle; and (3) Defendants were not deliberately indifferent to Ms. Ben's medical needs. ECF No. 37-1 at 10-20.

Defendants do not dispute that Deputies Moskal and Scott were assigned to transport Ms. Ben from the Circuit Court to MCCF on October 17, 2014, while Ms. Ben was on trial for first-degree murder. *Id.* at 3. They also do not dispute that the transport van did not have seat belts, that Ms. Ben was the only inmate in the van, and that Deputy Moskal was driving while Deputy Scott was in the front passenger seat. *Id.* at 3-4.

Defendants note that the Sheriff's policy on "Custody and Transporting Prisoners" provides that generally, deputies with custody of prisoners must "maintain a heightened degree of attentiveness," "be conscious of their surroundings and maintain control of any prisoner in their custody," and "avoid placing themselves in situations that would increase the potential for injury to themselves or the escape of a prisoner." ECF No. 37-3 at 2 (Montgomery County Sheriff General Operational Procedures 3.02(I)(A)). With regard to transporting prisoners and use of seat belts, the policy states that "[w]hen seat belts are available, they must be used during prisoner transports." *Id.* at 3 (Section 3.02(IV)(C)). This section of the policy is not inconsistent with the Federal Department of Transportation's National Highway Traffic Safety Standards, which exempt prisoner transport vehicles from the requirement of having seat belts. *See* ECF No. 37-4 (Fed. Reg. Vol. 78 No. 227, at 70437 §5. (Nov. 25, 2013)). The policy also addresses "Transporting Sick or Injured Prisoners," and provides that generally, "Deputies must seek

5

medical attention for their prisoners as soon as possible after learning of an illness or injury requiring treatment." ECF No. 37-3 at 4 (Section 3.02(IV)(J)(1)). Deputies are only mandated to provide immediate treatment for "life-threatening conditions (i.e. cardiac or respiratory arrest, profuse bleeding)." *Id.* (Section 3.02(IV)(J)(2)).

Deputies Moskal and Scott affirm that they are aware of the Sheriff's policy for transporting prisoners. *See* ECF No. 37-5, ¶ 8 (Affidavit of C. Moskal); ECF No. 37-6, ¶ 7 (Affidavit of S. Scott). The Deputies state that their actions during Ms. Ben's transport on October 17, 2014, were based on balancing Ms. Ben's need for medical attention for what appeared to be a non-serious shoulder injury with the security risks associated with transporting prisoners accused of violent crimes. *See* ECF No. 37-5, ¶ 13; ECF No. 37-6, ¶ 12. Both deputies state that Deputy Moskal had to brake hard on Maryland Avenue to avoid a collision because the vehicle directly in front of their van abruptly stopped to make a left turn from the travel lane instead of using the left turn lane. *See* ECF No. 37-5, ¶ 6; ECF No. 37-6, ¶ 5. According to the Deputies, Ms. Ben struck the partition wall of the van and was asked by Deputy Scott if she was injured. *See* ECF No. 37-5, ¶ 7; ECF No. 37-6, ¶ 6. Ms. Ben responded that her shoulder hurt, but did not complain of any head trauma, cardiac or respiratory distress, profuse bleeding, or anything else that might be a life-threatening condition. *Id.* [1] With concerns of security and escape, and because Ms. Ben was not complaining of any life-threatening condition, the Deputies decided to drive to MCDC, which was only five minutes away, to assess Ms. Ben's condition in a controlled, secure environment. *See* ECF No. 37-5, ¶ 9; ECF No. 37-6, ¶ 8.

---

[1] Ms. Ben denies stating that her shoulder hurt. Instead, she stated that she was in pain. ECF No. 42.

At MCDC, the Deputies examined Ms. Ben, who again only stated that her shoulder was sore,[2] and determined that she did not appear to have any life-threatening injury. *See* ECF No. 37-5, ¶ 11; ECF No. 37-6, ¶ 10. Despite Ms. Ben's request to return to MCCF without medical attention,[3] the Deputies decided to take her to Shady Grove Hospital and left after only spending five minutes at MCDC. *Id.* Within 35 minutes of the incident on Maryland Avenue, the Deputies arrived at Shady Grove Hospital and Ms. Ben was receiving care from hospital staff. *See* ECF No. 37-5, ¶ 13; ECF No. 37-6, ¶ 12. During that time, Deputy Scott was keeping his supervisor informed of the situation. *See* ECF No. 37-5, ¶¶ 9, 11; ECF No. 37-6, ¶¶ 8, 10.

The deputies' supervisor generated an incident report. *See* ECF No. 37-7 (Incident Report dated Oct. 17, 2014). The incident report documented the deputies' accounts of the events, including Ms. Ben's request to go back to MCCF instead of the hospital. *Id.* at 3. The report also indicated that after Ms. Ben's medical evaluation at the hospital, the "doctors advised the deputies there were no injuries, but that she would be admitted and kept overnight for observation as a precautionary measure." *Id.* Ms. Ben was subsequently released, and she returned to the Circuit Court on Monday, October 20, 2014, for her trial, which commenced at 9:34 a.m. *See* Case No. 123240C (Cir. Ct. for Montgomery Cty.), available at http://casesearch.courts.state.md.us/casesearch.[4]

---

[2] Again, Ms. Ben disputes this recitation. She states that she told them she was experiencing generalized pain that was most severe in her right shoulder and within her head, just behind her right eye. ECF No. 42, Aff. at 5.

[3] Ms. Ben denies making that request.

[4] Defendants attached a portion of the docket sheet from Ms. Ben's criminal trial in state court, but it does not include the proceedings that took place on October 20, 2014. *See* ECF No. 37-2. Under Federal Rule of Evidence 201, however, the court may take judicial notice of a matter of public record, as it "is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

## STANDARD OF REVIEW

Defendants' dispositive motion is styled as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Rule 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). Because Defendants have filed and relied on declarations and exhibits attached to their dispositive motion, and Plaintiff has responded in kind, the motion will be treated as one for summary judgment.

Summary judgment is governed by Rule 56(a), which provides in relevant part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In analyzing a summary judgment motion, the court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the

witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting former Fed. R. Civ. P. 56(e)). Because Ms. Ben is proceeding *pro se*, her submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nonetheless, the court must also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted).

## DISCUSSION

At the time of the incident giving rise to this case, Ms. Ben was a pretrial detainee in Montgomery County, Maryland. Accordingly, her claims are analyzed under the Fourteenth Amendment. *See Young v. City of Mt. Ranier*, 238 F.3d 567, 575 (4th Cir. 2001).

**I.     Deputies Moskal and Scott**

   *A. Failure to Protect*

Ms. Ben first claims that the deputies failed to protect her by directing her to sit in a van with no seat belts. ECF No. 29 at 7. The Fourteenth Amendment provides that pre-trial detainees be protected from a known risk of harm. *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004). The standards for assessing a failure to protect claim raised by a pretrial detainee are the same as those applied for an Eighth Amendment claim brought by a convicted inmate. *See, e.g., Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (finding that no determination as to

whether the plaintiff was a pretrial detainee or a convicted prisoner was necessary because "the standard in either case is the same—that is, whether a government official has been 'deliberately indifferent to any [of his] serious medical needs'" (alteration in original) (quoting *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990))); *Parrish*, 372 F.3d at 302 and n.11 (noting that the standard applicable to a pretrial detainee's claim of failure to protect "is the same as that which applies in cases arising under the Eighth Amendment," and accordingly finding cases applying Eighth Amendment standards "relevant to the Fourteenth Amendment claim here").

To establish a failure to protect claim, a prisoner must make two showings: first, that she suffered significant injury or was "incarcerated under conditions posing a substantial risk of serious harm;" and second, that the prison official at issue had a "sufficiently culpable state of mind." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). Under the first prong—the objective inquiry, "a prisoner must allege a serious or significant physical or emotional injury resulting from the challenged conditions," *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (quoting *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993)), "or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions," *id.* (citing *Helling v. McKinney*, 509 U.S. 25, 33-35 (1993)). Actual knowledge of a substantial risk does not alone impose liability. Where prison officials responded reasonably to a risk, they may be found free of liability. *Farmer*, 511 U.S. at 844.

The second showing is subjective and requires proof of deliberate indifference. *See Thompson v. Virginia*, 878 F.3d 89, 107 (4th Cir. 2017) (holding that deliberate indifference is the correct standard to apply where an officer refused to buckle the prisoner's seat belt, ignored his pleas for help, and failed to intervene to stop the other officer's dangerous driving). Ultimately,

"the test is whether the [prison officials] know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C. Dep't of Corrs.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)). To survive summary judgment, Ms. Ben must show facts sufficient for a reasonable factfinder to conclude that (1) she was exposed to a substantial risk of serious harm and (2) the Deputies knew of and disregarded that risk. *Thompson*, 878 F.3d at 107 (citing *Farmer*, 511 U.S. at 834, 837-38) (internal quotations omitted).

The fact that there were no seatbelts in the van, by itself, does not present a constitutional claim. *See Scott v. Becher*, 736 F. App'x 130, 134 (6th Cir. 2018) (noting that "failure-to-seatbelt cases 'involved mere negligence'" and did not rise to an Eighth Amendment violation) (citing *Thompson*, 878 F.3d at 105-06). However, when coupled with intentional misconduct, such as evidence of reckless, or intentionally dangerous, driving, it could. *See id.*

Here, the parties do not dispute that traffic was heavy at the time of Ms. Ben's transport. However, Ms. Ben alleges that there were two incidents of acceleration and sudden stop: the first forced her to slide down the bench and the second caused her to fall to the floor. Meanwhile, defendants state that there was one sudden stop, when Deputy Moskal had to brake hard to avoid a collision, during which Ms. Ben slid and fell.

Even assuming that Ms. Ben satisfies the objective component of her claim, she has not alleged facts sufficient to establish the subjective component—that the Deputies acted with a culpable state of mind. The first incident that Ms. Ben complains of resulted in no cognizable harm; she simply slid across the bench in the back of the van and came to a rest, seated upright. Her body was travelling at the same speed as the van in traffic, and yet came to a gentle rest as the van decelerated. The Defendants' driving did not, therefore, expose Ms. Ben to a substantial risk

11

of serious harm. As to the second incident, there is no evidence Deputy Moskal or Deputy Scott possessed actual knowledge of a risk of harm to Ms. Ben while transporting her from the Circuit Court to MCCF. They could not have predicted that they would have to brake hard on Maryland Avenue to avoid a collision. Moreover, the Sheriff's policy on "Custody and Transporting Prisoners," under which the Deputies were operating, provided that seat belts must be used during prisoner transports "[w]hen seat belts are available." ECF No. 37-3 at 3. Here, the transport van did not have seat belts, nor was it mandated to have any by the Federal Department of Transportation's National Highway Traffic Safety Standards.

As to Ms. Ben's assertion that there was intentional misconduct on the part of the Deputies, evidenced by the two incidents of acceleration and sudden stop, she has not "presented sufficient evidence to create a genuine issue of material fact as to deliberate indifference." *See Thompson*, 878 F.3d at 106-07. The Defendants performed one safe deceleration and one sudden stop that was required by the circumstances to avert greater harm. Whether considered in isolation or together, these two incidents provide no cognizable evidence of deliberate indifference.

Based on this record, Ms. Ben fails to show that the Deputies had "a sufficiently culpable state of mind" amounting to "deliberate indifference" to her health or safety," *Farmer*, 511 U.S. at 834. Therefore, she cannot prevail on her claim and summary judgment in favor of Deputy Moskal and Deputy Scott is appropriate.

### B. *Excessive Force*

Next, Ms. Ben claims that the deputies subjected her to cruel and unusual punishment when: (1) they continued to travel while aware that she was on the floor; (2) Deputy Moskal engaged in reckless driving; and (3) Deputy Scott, who lacked medical training, lifted her from the floor of the van. ECF No. 29 at 7-10. The Fourteenth Amendment's Due Process Clause

"protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, __ U.S. __, 135 S.Ct. 2466, 2473 (2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)). "[T]he appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." *Id*. It is enough that "a pretrial detainee show that the 'force purposely or knowingly used against him was objectively unreasonable,' regardless of an officer's state of mind." *Dilworth v. Adams,* 841 F.3d 246, 255 (4th Cir. 2016) (quoting *Kingsley*, 135 S.Ct. at 2472). Pursuant to *Kingsley,* this court must consider whether under the "facts and circumstances" of this particular case, and from the "perspective of a reasonable officer on the scene," the force used against Ms. Ben was objectively excessive. *Kingsley*, 135 S.Ct. at 2473.

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U. S. 1, 6-7 (1992). The absence of significant injury alone is not dispositive of a claim of excessive force. *Wilkins v. Gaddy*, 559 U.S. 34 (2010). The extent of injury incurred is one factor indicative of whether the force used was necessary in a particular situation, but if force is applied maliciously and sadistically, liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *Id*. at 38.

Here, Ms. Ben claims that the deputies maliciously continued to drive for some time, over bumps, with the knowledge that she had hit the steel partition and was in pain on the floor of the van. According to the deputies, however, their decision to drive to MCDC before further examining Ms. Ben's injuries was based on balancing Ms. Ben's need for medical attention for what appeared to be a non-serious shoulder injury with the security risks associated with transporting prisoners accused of violent crimes. *See* ECF No. 37-5, ¶ 13; ECF No. 37-6, ¶ 12. With concerns of security and escape, the deputies proceeded to MCDC, which was only five

minutes away, to assess Ms. Ben's condition in a controlled, secure environment. Deputy Moskal states that although he "took extra precaution to drive to MCDC without jostling the van and make her condition worse . . . , the driveway leading into the sally port of the detention center has speed bumps that are unavoidable." ECF No. 37-5 at 4. Upon their arrival at MCDC, Deputy Scott then assessed Ms. Ben's condition and "adjusted her handcuffs so that her hands would be in front of her body instead of behind." ECF No. 37-6 at 4.

Applying the *Kingsley* factors, Ms. Ben's allegations do not satisfy the objective prong of an excessive force claim. Given that the Sheriff's policy on "Custody and Transporting Prisoners" advises deputies to "avoid placing themselves in situations that would increase the potential for injury to themselves or the escape of a prisoner," ECF No. 37-3 at 2, and the fact that Ms. Ben was on trial for first-degree murder at the time of the incident, ECF No. 37-2, the Deputies' actions were not objectively unreasonable. Based on this record, Ms. Ben was not subjected to excessive force and the Deputies are entitled to summary judgment on this claim.

### C. *Deliberate Indifferent to a Serious Medical Need*

Ms. Ben also alleges that the deputies were deliberately indifferent to a serious medical need when they: (1) failed to call an ambulance or medical assistance after discovering that she hit the partition in the van; (2) stated that Ms. Ben needed medical attention but nonetheless exited the van, leaving her on the floor; and (3) failed to notify a supervisor or call for medical personnel after returning to discover her on the floor. ECF No. 29 at 7-10. According to Ms. Ben, the deputies' actions caused her seizure disorder. *Id.* at 10.

Deliberate indifference to a serious medical need requires proof that, objectively, the plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available.

14

*See Farmer*, 511 U.S. at 834-37; *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson*, 503 U.S. at 9; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241; *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40; *see also Anderson v. Kingsley*, 877 F.3d 539, 544 (4th Cir. 2017). Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his actions were inappropriate in light of that risk.'" *Anderson*, 877 F.3d at 545 (quoting *Parrish*, 372 F.3d at 303); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference because 'prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *see also Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016) ("[A] prison official's response to a known threat to inmate safety must be reasonable."). Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*,

15

240 F.3d 383, 390 (4th Cir. 2001). While "a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need." *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013).

"Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999); *see also Jackson*, 775 F.3d at 178 (describing the applicable standard as an "exacting" one).

Again, even assuming that Ms. Ben satisfies the objective component of her claim, she has not alleged facts sufficient to establish the subjective component—that the deputies knew of the general risk of harm to Ms. Ben and that their actions were inappropriate in light of that risk. Here, after hearing Ms. Ben strike the partition wall, Deputy Scott asked if she was injured. *See* ECF No. 37-5, ¶ 7; ECF No. 37-6, ¶ 6. Ms. Ben responded that her shoulder hurt, but did not complain of any head trauma, cardiac or respiratory distress, profuse bleeding, or anything else that might be a life-threatening condition. *Id.* She stated only that she was "in pain." ECF No. 29 at 4-5. The Deputies reasonably decided to drive to nearby MCDC further to assess Ms. Ben's condition, during which Deputy Scott verbally checked on Ms. Ben once more. Upon their arrival at MCDC, Deputy Scott moved Ms. Ben from the floor to the bench and adjusted her handcuffs to be in front. The Deputies also decided to take Ms. Ben to the hospital, where she was seen by medical staff within 35 minutes of the start of the entire incident.

Based on this record, Ms. Ben has not shown that the Deputies acted inappropriately in light of the risk of any harm to her. The incident report documenting the events shows that the

16

deputies brought Ms. Ben to the hospital despite her request to go back to MCCF.[5] The report also indicates that after Ms. Ben's medical evaluation at the hospital, the "doctors advised the deputies there were no injuries, but she would be admitted and kept overnight for observation as a precautionary measure." *Id.* This is not inconsistent with the medical records presented by Ms. Ben with her response in opposition to Defendants' disposition motion, which reflect that she was:

> being transported from her trial to jail when the driver suddenly braked to avoid hitting the car in front of him. Pt did not lose consciousness, c/o R shoulder pain after incident, pt was unsure of whether or not she hit her head. When they arrived at the jail, pt was c/o R shoulder pain and a pain behind her eyes so police put her back in the car to bring to the ED, pt was talking to police in car but 5 minutes away from the hospital she started seizing.

ECF No. 42-7 at 6. The records provided by Ms. Ben also confirm that she was released on October 19, 2014, *id.*, in time to return to the Circuit Court on October 20, 2014 for her trial.

Beyond cursory allegations in her pleadings, Ms. Ben has offered no evidence to support a claim of deliberate indifference to a serious medical need. Summary judgment in favor of the deputies is therefore appropriate.

**II.     Sheriff Popkin**

Ms. Ben's amended complaint states that she is suing Sheriff Popkin in both his individual and official capacities. ECF No. 29 at 3. As a matter of Maryland law, county sheriffs and deputy sheriffs are officials and/or employees of the State, not the county. *See Rucker v. Harford Cty*, 558 A.2d 399, 402 (1989). In addition, Sheriff Popkin's alleged wrongdoing in this case involves his role in providing transportation of a prisoner to and from court for trial, which is by statute a state function. *See* Md. Code Ann., State Fin. & Proc. § 9-108(a)(3); State Govt. § 12-405(a)(3).

---

[5] Ms. Ben denies that she asked to return to MCCF.

Under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from citizen suits in federal court absent state consent or Congressional action. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). The State of Maryland has not waived such immunity for claims brought pursuant to § 1983. Accordingly, Sheriff Popkin is immune from suit for actions taken in his official capacity.

As to actions taken in his individual capacity, Ms. Ben alleges only that Sheriff Popkin approved her transport with no seat belts and failed to supervise and train Deputies Moskal and Scott for medical emergencies. ECF No. 29 at 8. Sheriff Popkin cannot be held liable simply because he occupied a supervisory position, as the doctrine of respondeat superior does not apply to § 1983 claims. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001); *see also Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). A supervisory official cannot be held liable for the acts of a subordinate unless the supervisor's "indifference or tacit authorization of subordinates' misconduct" can be deemed to have caused the injury to the plaintiff. *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). For a supervisor to be found liable for such acts, a plaintiff must prove that (1) the supervisor has actual or constructive knowledge that the subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to individuals like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the subordinate's misconduct; and (3) there was an affirmative causal link between

the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Id.*; *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Here, Ms. Ben has not shown that her constitutional rights were violated. In addition, her assertions do not demonstrate any pattern of widespread abuse necessary to establish supervisory action or inaction giving rise to § 1983 liability. *See Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) (stating that "[g]enerally, a failure to supervise gives rise to § 1983 liability, however, only in those situations in which there is a history of widespread abuse").

At best, the complaint and evidence establish that the Montgomery County Sheriff's Office has policies in place when transporting pretrial detainees. *See* ECF No. 37-3. Adhering to the general operational procedures does not amount to participation in the alleged constitutional violation sufficient to confer liability. Nor has Ms. Ben put forward any evidence that Defendants are liable pursuant to *Monell v. Dep't of Soc. Servs. of the City of New York*, for unconstitutional actions taken pursuant to an official policy, custom, or practice. 436 U.S. 658, 690-91 (1978).

To the extent Ms. Ben claims that Defendants violated their own policy, such a claim does not rise to a constitutional violation. The adoption of procedural guidelines does not give rise to a liberty interest; thus, the failure to follow regulations does not, in and of itself, result in a violation of due process. *See Culbert v. Young*, 834 F.2d 624, 628 (7th Cir. 1987); *accord Kitchen v. Ickes*, 116 F. Supp. 3d 613, 629 (D. Md. 2015), *aff'd*, 644 F. App'x 243 (4th Cir. 2016).

Accordingly, viewing the facts as pleaded most favorably to Ms. Ben, summary judgment is granted in favor of Defendants.[6]

---

[6] In light of the court's ruling, an analysis of the Defendants' qualified immunity argument is not necessary.

## CONCLUSION

For the foregoing reasons, Defendants' dispositive motion, construed as a Motion for Summary Judgment, is granted. A separate Order follows.

September 12, 2019

/s/
DEBORAH K. CHASANOW
United States District Judge